**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: March 30 2020**

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 18-30927 |
| | ) | |
| Brian R. Somogye, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 18-03037 |
| | ) | |
| Jim Ott and Linda L. Ott, | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| Brian R. Somogye, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### <u>MEMORANDUM OF DECISION</u>

This adversary proceeding is before the court for decision after trial on Plaintiffs Jim and Linda Otts' ("Plaintiffs" or "Otts") complaint to determine the dischargeability of a state court judgment debt owed to them by Defendant Brian R. Somogye ("Defendant" or "Somogye"). Defendant is the debtor in the underlying Chapter 7 case, in which he has received his discharge. The Otts contend Somogye owes them a debt allegedly resulting from fraudulent representations about his qualifications to perform a new garage construction and home remodeling contract for them and that the debt should be excepted from his Chapter 7 discharge under 11 U.S.C. § 523(a)(2)(A).

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) as a civil proceeding arising under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine dischargeability of debts are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

This memorandum of decision constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, applicable to this adversary proceeding under Rule 7052 of the Federal Rules of Bankruptcy Procedure. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the six witnesses, considered all the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds the Defendant is entitled to judgment in his favor.

## **BACKGROUND FACTS**

For several years prior to 2016, Linda and Jim Ott had discussed building a garage on their property. The Otts ultimately chose Somogye to undertake the project, which also involved remodeling their home. According to the parties' contract, the scope of the project "included but [is] not limited to the following…":

- Construct 24 x 40 garage per drawings including a 2 piece bathroom with toilet under the stairs and small septic system
- Remove small shed and preserve for future donation to historical society. Dig out base of shed and break up concrete or block base. All items from shed and garage will be stored in a storage trailer until it can be put in the new garage.
- Remove chimney and repair roof remove chimney all the way to basement and repair walls, shingle to match existing roof. Examine complete roof and make sure it's in good repair. Repair as needed.
- Paint exterior siding or replace with vinyl to match color choice of customer and repair any spots necessary in exterior walls.
- Remove cistern in basement and reroute downspouts, Finish off floor to match existing floor.
- Replace boiler with forced air heat and air conditioning, remove any piping and radiators. Remove fuel oil tanks.
- Install new plumbing and electrical in the house including switches and add light fixtures where requires or desired
- All repair and replacing of interior walls will be finished by the same crew so design of texture matches through the house.
- Remodel kitchen with new cabinets, plumbing, fixtures, and flooring. Add dishwasher, new stone countertop and backsplash

2

- Insulate complete house including walls, attic and basement edges. Insulate floor in enclosed area on the front of the house
- Remodel existing garage to man cave including a bathroom with shower, heated wood floors
- Finish master bedroom closet where chimney was removed, remodel attic closet as a heated/cooled dressing room and storage area
- Remodel mud room area by adding closet and washer and dryer
- New carpeting in some areas and hardwood in others, per customer, entire house
- New basement windows, new entry doors in all entry's
- Add exhibit shelf in dining room with accent lighting
- Use vintage lumber and trim to match period of house
- Add hidden gun safe location and design to be determined

[Plt. Exs. 1 and 27]. Somogye broke down the cost *estimate* in the contract as follows:

- Construct garage ……………………………………………… $ 12,500.00
- Kitchen…………………………………………………………… 15,000.00
- HVAC……………………………………………………………. 10,000.00
- Bath……………………………………………………………… 5,000.00
- Insulation………………………………………………………… 2,500.00
- Electrical………………………………………………………… 4,500.00
- Plumbing………………………………………………………… 3,500.00
- Cistern/concrete………………………………………………… 3,000.00
- Demo/moving…………………………………………………… 10,000.00
- Construction……………………………………………………... <u>15,000.00</u>
- Total……………………………………………………………... $ 81,000.00

[*Id.*; (emphasis added)]. The contract estimated completion of the project in 9 to 12 weeks. Terms of payment were "$20,000.00 deposit. $20,000.00 upon completion of garage and beginning house. $20,000.00 when ½ way thru house project, balance due upon completion." [*Id.*]. On February 8, 2016, the Otts and Somogye signed the contract and the Otts wrote Somogye a check for the initial $20,000.00 deposit, [Plt. Ex. 27], which he cashed.

From the outset the project dragged on. According to Mrs. Ott, Somogye gave a number of excuses for the slow progress, such as crew members not showing up, one person taking an extended vacation, there was too much rain, etc. It was these numerous false starts, "promises of tomorrow", and slow progress that prompted the Otts to terminate Somogye from the project in August 2016, well before it was complete.

In October 2016, the Otts filed suit against Brian and Mary Somogye in the Court of Common Pleas, Lucas County, Ohio alleging five causes of action arising out of the failed construction project. *Ott et al. v. Somogye, et al.*, Case No. CI 2016 04590 (Lucas County, Ohio Common Pleas Court). The

3

Otts stated claims for breach of contract, fraudulent misrepresentation, and violation of the Ohio Consumer Sales Practices Act, and a claim of fraudulent transfer of property. Somogye represented himself in the state court litigation and filed an answer. The Otts prevailed on their motion for summary judgment on liability based upon unanswered requests for admission, which were deemed admitted. At a hearing on damages, Somogye appeared and was afforded an opportunity to litigate the Otts' claimed damages. On January 3, 2018, the State Court issued judgment as follows:

A. The Plaintiffs are granted a judgment against defendant, Brian R. Somogye in the sum of $26,892 for compensatory damages.
B. The Plaintiffs are granted a judgment against defendant, Brian R. Somogye, in the sum of $80,676.00 for treble damages for violation of the Consumer Sales Practices Act and fraud.
C. The Plaintiffs are granted a judgment against the defendant, Brian R. Somogye in the sum of $4,700 for attorney fees for violation of the Uniform Fraudulent Transfer Act and fraud.

[*See* Plt. Ex. 40].

In April 2018, Somogye filed his petition for relief under Chapter 7 of the Bankruptcy Code. The Otts timely filed this adversary action to determine dischargeability of the judgment debt. Plaintiffs initially filed a motion for summary judgment based upon the State Court judgment, arguing its preclusive effect as to their nondischargeability claim in this court. In denying their motion for summary judgment, this court found it could not give preclusive effect to a prior judgment based upon requests for admissions. [Doc. # 18]. As a result, the court conducted a trial on Plaintiffs' adversary complaint.

## LAW AND ANALYSIS

A discharge under Chapter 7 of the Bankruptcy Code is subject to the exception of certain types of debts listed in 11 U.S.C. § 523(a). *Stamper v. United States (In re Gardner)*, 360 F.3d 551, 557 (6th Cir. 2004). The Otts' complaint raises one of those exceptions: whether the judgment debt should be excepted from discharge under § 523(a)(2)(A) because of conduct by Somogye involving false representations.

The statutory exceptions are intended to implement the fundamental bankruptcy policy of affording a "fresh start" only to "the honest but unfortunate debtor." *Id.* (citing *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)). In order to implement the fresh start policy, the exceptions to discharge for debts listed in § 523(a) are to be construed narrowly. *Rembert v. AT&T Universal Card Svcs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, [or] services, . . . to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement

4

respecting the debtor's or an insider's financial condition...." Plaintiffs' complaint is premised upon alleged fraudulent misrepresentations made by Somogye regarding his qualifications to perform the project.

The breach of a construction contract does not itself establish fraud or fraudulent misrepresentations for purposes of § 523(a)(2)(A). *In re Antonious*, 358 B.R. 172 (Bankr. E.D. Pa. 2006) (quoting *In re Maurer*, 112 B.R. 710, 712 (Bankr. E.D. Pa. 1990)). Rather, the Sixth Circuit requires that to except a debt from discharge under § 523(a)(2)(A) based on a false representation, a plaintiff must prove the following elements: (1) the debtor obtained money, property, services or credit through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of the loss. *Rembert*, 141 F.3d at 280-81. The Otts, as the creditors seeking exception of a debt from Somogye's Chapter 7 discharge, have the burden of proof by a preponderance of the evidence. *Grogan,* 498 U.S. at 291.

The court will address Plaintiffs' nondischargeability claim under § 523(a)(2)(A) by the elements in *Rembert*. Each of the elements constitutes a finding of fact, and failure to prove any one of them defeats the claim. *See Palmacci v. Umpierrez*, 121 F.3d 781, 787(1st Cir. 1997) (parses standards of proof of a § 523(a)(2)(A) claim into six elements).

### A. First Prong of *Rembert*

The first prong of *Rembert* itself has several parts. *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003). Plaintiffs proved at trial and there is no dispute that they paid Somogye the $20,000 deposit under the contract, [Plt. Exs. 1, 27 and 4 (p.1)], and advanced some additional funds to him. The state court entered a money judgment against him. [Plf. Ex. 40]. *Kap's Construction v. Cruz-Brewer (In re Cruz-Brewer)*, 609 B.R. 1, 7-8 (Bankr. M.D. Pa. 2019) (state court money judgement is sufficient evidence of an enforceable debt against a debtor under state law).[1] Defendant obtained money from Plaintiffs and owes them a debt. Was that debt incurred based on a representation? Was that representation material? Was it false? Did Somogye make it knowing it was false, or with gross recklessness as to its truth?

---

1 A finding that there is an enforceable claim at state law nevertheless has no preclusive effect with respect to the federal question of whether the debt is nondischargeable. *In re Cruz-Brewer*, 609 B.R. at 8. In the instant case this court decided on summary judgment that the Lucas County Common Pleas Court's judgment lacks preclusive effect in determining nondischargeability.

### Did Somogye Make Representation(s) to the Otts?

Not every statement made by a debtor will qualify as a representation for purposes of § 523(a)(2)(A). A representation must state an existing or past fact, *In re Owens*, 549 B.R. 337, 355 (Bankr. D. Md. 2016), and not merely an expression of opinion or a prediction of the future, *In re Copeland*, 291 B.R. at 762; *In re Cruz-Brewer,* 609 B.R. at 10.  Nor will "mere puffery" or an exaggerated statement such as that a contractor only uses workers of the "highest caliber" constitute an actionable representation. *In re Campbell*, 545 B.R. 875 (Bankr. M.D.N.C. 2016); *In re Copeland*, 291 B.R. at 762. A promise to do something or a contractual requirement is not an actionable "representation" in this context unless the debtor never intended to perform it in the first place. *Palmacci,* 121 F.3d at 786.

The Otts' adversary complaint avers as a [mis]representation only the following statement made by Somogye to Plaintiffs: "Defendant represented that he was experienced in new construction."  [Doc. # 1 at ¶ 17].  The testimony at trial was slightly different. When asked what he told the Otts about his experience, Somogye testified, "They asked if I had experience building and remodeling and I told them yes.  And what I don't know, I hire somebody that does know."  Mr. Ott testified that Somogye represented he could do the job, "that construction of the garage was within his capability and that the house would not be a problem."  On direct examination, Mr. Ott was unable to recall any more specific statements made by Somogye as to his new construction experience.   In confirming that Somogye stated that he could do the job, Mr. Ott testified that Somogye, "represented that he'd had experience but didn't locally, related to new construction."  Somogye did not deny at trial that he made the statements Ott testified that Somogye made. Nor did Ott deny that Somogye made the statements he testified that he made to Ott. The following statements made by Somogye are at issue:

- He had experience building and remodeling and what he doesn't know he hires somebody that does know
- He had experience related to new construction, but not locally
- He could do the job, as construction of the garage was within his capability and the house would not be a problem

These three statements are a mixed bag.

Somogye's first statement is a combination of actionable representation of present or past fact—Somogye had experience building and remodeling—and, absent proof that he never intended to perform, nonactionable promise—that what he did not know, he would hire somebody who did. The latter statement reflects Somogye's role on the overall contract, which the parties did not dispute as understood,

6

as both doing hands on work and functioning as a general contractor.

Somogye's second statement—that he had experience related to new construction, but not locally-- is a variation on the first part of the first statement, and also an actionable representation as a statement of present or past fact notwithstanding its generality.

Somogye's third statement—that he could do the job, as construction of the garage was within his capability and the house would not be a problem—is also an actionable representation of fact. Albeit only generally, he is communicating to the Otts his qualifications and skills in light of the scope of the project agreed to by the parties. It is not mere puffery or an exaggerated opinion about his capabilities, *e.g.* "I'm the best" or words like that.

The court finds that Somogye made representations to the Otts within the meaning of § 523(a)(2)(A) and the first prong of *Rembert*.

### Were Somogye's representations material to the transaction?

It is tempting to think that any representation made to a customer is material. But the court can envision circumstances where that would not be the case. For example, if Somogye told the Otts that he had graduated from high school in 1974, and it was actually in 1975, that would not have been material to the transaction at hand. Representations about builder qualifications and experience in home improvement, construction and remodeling projects are, however, an unsettlingly common subject of § 523(a)(2)(A) litigation. *E.g., Billings v. Escalante (In re Escalante)*, Case No. 7-10-10837 JL, Adversary No. 10-1147 J, 2011 WL 2600717, *5, f.n. 11 (Bankr. D.N.M. Jun. 29, 2011) (examples of cases involving representations about qualifications made by builders on home construction and remodeling projects, some actionable and some not); *Keene v. Mugford (In re Mugford),* 346 B.R. 284 (Bankr. D. Mass. 2006).

The court finds that the three representations Somogye made about his experience and qualifications were material. It almost goes without saying that a contractor's capabilities and experience to do a construction job are material to a home remodeling and construction contract as having a natural tendency to influence a creditor's decision. *Lansden v. Jones (In re Jones)*, 585 B.R. 465, 507 (Bankr. E.D. Tenn. 2018) (the test for materiality is whether statement was capable of influencing, or had a natural tendency to influence the creditor's decision, quoting *United States v. Keefer,* 799 F.2d 1115, 1127 (6th Cir. 1986)).   The court finds that Somogye's statements comprise "the essence" of this transaction and were material within the meaning of the first prong of *Rembert. In re Copeland*, 291 B.R. at 761.

7

**Were Somogye's representations false?**

The third part of the first *Rembert* element is whether the debtor made a representation with either knowing falsity or gross recklessness as to the truth. Before getting to the state of mind with which Somogye made a representation, Plaintiffs must prove that it was false.

As to Somogye's representations that (1) he had experience in building and remodeling and (2) that he had experience related to new construction, but not locally, the court finds that Plaintiffs have not proven by a preponderance of the evidence that they were false. His representations focus on two aspects: general building and remodeling experience and new construction experience. Their generality makes it hard to prove falsity, and Plaintiffs have not done so.

Somogye's testimony and his resume, [Plt. Ex. 5], establish that he did have home remodeling and general building experience, beginning in college. His resume shows that for an extended period of time, from 2005 through August 2016, he worked in "[h]ome remodeling and construction including fire and flood damage" both as Brian R. Somogye and as Somogye Homeworks. From 1990 through 2000, his resume shows that he was "[s]elf-employed in the building trades," including building rehab and demolition. [*Id.*] The court finds no basis in the trial record to question the information on his resume and his testimony about it, which the court found credible, as supporting the general representation he made to the Otts that he had experience in building and remodeling. Plaintiffs did not prove by a preponderance of the evidence that Somogye's representation that he had experience in building and remodeling was false.

As for new construction experience, Somogye testified that he built 3 or 4 garages in the 1970s. Somogye conceded that his resume did not reflect new construction experience because he built those garages when he was in college and his "first real job" was not until 1980, which is where his resume begins. Nevertheless, the court finds credible Somogye's testimony that he did build garages and thus had new construction experience as generally represented. Somogye also conceded at trial that he had never had built a new home. The information on his resume is ambiguous at best as to whether "[h]ome remodeling and construction" could be interpreted to include building new homes. There is no evidence that he represented to the Otts that he had built new homes or that he had provided his resume to the Otts in connection with his engagement. Mr. Ott testified that he had a conversation about new construction experience with Somogye before they hired him, however, the record is silent on details of that conversation. Nothing in the record shows that Somogye made any representations to the Otts about the recency or timing or extent of his new construction experience or even that he was asked about it. As

8

presented at trial, his representations at the time the Otts hired him were very general. There is no evidence that contradicts the generality of his contemporaneous representations and there was no dispute among the parties that the general representations as testified to were made. Plaintiffs did not prove by a preponderance of the evidence that Somogye's representation that he had experience in new construction, but not locally, was false.

The court finds more problematic Somogye's representation that "he could do the job, as construction of the garage was within his capability and the house would not be a problem." The falsity of the statement that the house would not be a problem for him cannot be tested because the Otts terminated the contract before those parts of the project got underway. The crux of this case is whether Somogye falsely represented to the Otts that "construction of the garage was within his capability."

The evidence is overwhelming that the work on the garage before the Otts terminated Somogye from the project was not done in a timely, proper and workmanlike manner. Shoddy is the word that comes to mind. Plaintiffs have unquestionably proven a breach of contract case against Somogye. The question is, of course, whether they have proven fraud.

Deficiencies in the construction done by Somogye and under his watch were addressed by three of Plaintiffs' witnesses, one of whom (Richard Light) took over the job after Defendant was terminated from the project and two experts, one who visited the site a month after Defendant was fired (Larry Fast) and a second (Larry Miller) who later reviewed job site photos and project blueprints.

Richard Light, a retired carpenter and Linda Ott's brother, testified that the Otts asked him to take over the project in August 2016. At that time, he testified that things were "out of sync and not done right." At the time Light came on board, the roof and siding on the garage were in place. The garage floor had been poured, taken out, and was ready to be re-poured. Light stated that the floor plans for the second floor called for 16" floor I-joists, but 2 x 10s were used instead. He explained that the 2 x 10s were insufficient because they could not span the required 24 feet and they were not as strong. He characterized the 2 x 10s "like walking on a trampoline." He noted the foundation wall to the back of the garage [Plt. Ex. 7] was not straight and off by almost 3.5 inches. Light explained because the foundation wall was not done properly it could cause problems with the sill plate, which connects the wall to the foundation and, in turn, could create a structural problem. Light also noted a lack of anchor bolts in the foundation wall and a number of other issues which were "not perfect." Light testified he undertook a number of remedial measures to correct deficiencies. With regard to the water in the garage, he opined that the grade of the driveway should have been built up 6 to 8 inches. This was because the

9

driveway sloped down to the garage site and a hard rain would result in water getting into the garage, as it did.

Larry Fast, a structural and forensic engineer, testified that he inspected the site on September 29, 2016. His field notes reflected 15 workmanship defects, with some of them the same as those mentioned by Light. Fast's list of workmanship defects includes: concrete foundation walls were not straight; exterior walls overhanging the foundation walls too far; both 24'-0" end walls were out-of-plumb; the stairway was constructed too close to the west end wall and a code-required 6'-8" head room did not exist; not all of the attic joists had bridging installed between the attic floor joists; ventilation spaces did not exist in the eaves of both sidewalls to allow proper cross ventilation inside the attic; at the east end of the garage, the 2 x 10 joists were undersized and should have been 16" I-joists; the garage's eaves height was to be 10'-6" but was built 9'-5"; and the garage floor was too low. [Plt. Ex. 22]. Fast noted that the garage's eaves height was contrary to the plan drawings. He, too, was critical of the site grading as being too low. Fast noted that a general contractor is responsible for assessing proper site grade and should check slope relative to the surrounding grade. He observed that a general contractor is "responsible to construct the project according to the drawings and to meet current codes." Fast also testified that anchor bolts should be placed during the foundation wall construction.

Plaintiffs also presented the testimony of Larry Miller, a licensed architect. Miller likewise testified to the lack of anchor bolts in the foundation wall and the purpose of anchor bolts. He confirmed that faulty placement of the sill plate, which sat upon a bowed foundation wall, could impact the wall's structural integrity.

The garage drawings called for a basic bathroom on the first floor. When asked about the "survivalist septic system" (Somogye's term), Mr. Ott testified that it was for a bathroom in the garage. When Miller was asked about this septic system, he said he had never heard of such a thing in his 40 years of experience. Miller explained a septic system as a distribution system comprised of a stone leach field in order to filter waste that is required to be a certain distance from the structure. He testified that the design and installation of a septic system is regulated by the county health department. He noted some of the requirements of installing a septic system include employing a licensed plumber, a permit, and approval of the design by the health department. In Miller's opinion, the septic system depicted in Plaintiffs' Exhibit 28 appeared deficient as it was lacking basic requirements, including the layout and lack of stone. Nothing in the record indicates a plumber was engaged to assist in installation or that Somogye obtained a permit. However, it is not known from the record what was ultimately installed if

10

something different.

Two of Plaintiffs' witnesses opined as to the contractor's (Somogye's) construction knowledge, which is the general gist of Somogye's representations. When Richard Light, the contractor who took over the project, was asked his opinion of Defendant's new construction knowledge, Light stated, "I would say he didn't have any knowledge, I would say that him or his workers didn't do a good job. Whether they knew what they were supposed to do . . . but it was not done properly in my opinion." Both Light and Larry Miller testified that the general contractor is responsible for making sure the work is done properly by contractors, which is largely where the problems on the project occurred. When Larry Miller was asked for his opinion of Defendant's knowledge as to garage construction, based upon the photographs introduced at trial, Miller stated, "It looks like a child did it, someone who had never done it before. It looks like a homeowner did it himself, someone who had no experience. Almost no knowledge of the way it should be done."

Somogye explained at trial how some of the significant construction problems arose. Somogye testified that the wavy foundation wall poured for the garage was not straight because of unexpected and substantial water issues. There was so much water they had to dig a well behind the construction site to pump excess water. Somogye stated the framework was probably wet and did not stay straight when the contractor poured concrete. In addition, the bracing sunk into the dirt. In his words, "the back wall gave us a lot of headaches." This work was done by a concrete contractor and Somogye conceded that the contractor was nevertheless paid. Somogye tried to remedy this defect, thus showing that he knew it was a problem. After the concrete floor was removed, an additional brace was placed to pour a contiguous wall to be pinned to the initial wall. Somogye had planned on chipping out the bowed outer side of the wall to straighten it up. But Somogye was terminated from the project before he could complete these fixes.

When asked why he used 2 x 10s versus I-beams in the joists between the first and second floors, Somogye said the plan changed to putting a steel I-beam down the center of the garage because it would provide more strength than the I-beams in the plan. He testified that due to the change in the height of the soffit and the pitch of the roof, it made more sense to put an I-beam in the center. He also stated the pitch of the roof was changed from 12-10 to 8-12 or 6-12, at the recommendation of the roofer. Somogye did not seek permission from the Otts to make that change and testified he "was given a wide berth" "to try to accomplish Linda Ott's dream garage so we just set ourselves to the task, whatever it took." Somogye agreed he was in charge of the project and hired the subcontractors. He also stated

11

there were no building codes nor were permits needed to build the garage in Berkey.

This is the record against which the falsity of Somogye's representations to the Otts about his ability and experience to build the garage must be measured. Somogye hired subcontractors for the foundation and roof. He explained what happened with the pouring of the foundation and the roof changes. The rain and water problems are credible explanations for the waviness of the walls that do not tend to show his representation that he could do the job, including by inference that it was within his capability to properly supervise contractors he hired, was false when made. That he recognized the problem and was taking steps to fix it blunts the inference that the problem shows he simply did not know what he was doing. Likewise, Somogye's explanation about the beams and change in roof pitch are not indicative of the falsity of his representation when made in the court's view. Rather, this problem presents as a difference of opinion based on the recommendation of a subcontractor.

But the court finds three fundamental problems that stand out as potentially showing that Somogye did not have the knowledge and experience to either oversee as a general contractor or perform himself the work needed to build the Otts' new garage. Those three problems are the site grade, the lack of anchor bolts in the garage foundation walls, and the "survivalist" septic system. As confirmed by the testimony of Fast and Miller, these problems are so fundamental that they show Somogye's knowledge and experience to build and supervise the garage build were not up to the task. In other words, his representation was false.

No explanation has been offered for the lack of proper anchor bolts in the foundation walls. The credible testimony of Fast and Miller show how basic and important a step they are. Their unchallenged opinions that either Somogye or the contractor he hired did not know what they were doing belie the truth of his statement that the garage project was within his capability, whether to do himself or oversee. Likewise, the grade problems with the site.

It appears that Somogye undertook the so-called "survivalist" septic system on his own, without engaging a contractor. The photos, as well as Larry Miller's testimony, tend to show that he did not know what he was doing as far as the septic system was concerned. Somogye had no idea what was required of even a small septic system, including plumbing expertise and a permit, again belying the truth of his representation that the garage project was within his capability to perform or oversee.

The court finds that the fundamental, obvious problems with the anchor bolts, the site grade and the septic tank show that Somogye's representation about his capability to build or get the garage built as agreed was false when made.

12

**Was Somogye's false representation made knowingly or with gross recklessness as to its truth?**

Proof of falsity alone is not enough to establish the first prong of *Rembert*. Plaintiffs must also prove that that, when made, Defendant knew the representation was false or made it with gross recklessness as to the truth. There was no further amplification of these standards by the Sixth Circuit in *Rembert*. Another court generally described them as follows:

> "Knowing" means "[h]aving or showing awareness or understanding" and includes conscious or deliberate acts. BLACK'S LAW DICTIONARY 876 (7th ed. 1999). As applied to § 523(a)(2)(A), "the concept of misrepresentation includes a false representation as to one's intention, such as a promise to act. 'A representation of the maker's own intention to do. . . a particular thing is fraudulent if he does not have that intention' at the time he makes that representation." *Palmacci*, 121 F.3d at 786 (quoting RESTATEMENT (SECOND) OF TORTS § 530(1)). "Reckless disregard" is defined as "[c]onscious indifference to the consequences of an act)." BLACK'S LAW DICTIONARY 1276 (7th ed. 1999). Similarly, "[r]ecklessness involves a greater degree of fault than negligence but a lesser degree of fault than intentional wrongdoing." BLACK'S LAW DICTIONARY 1277 (7th ed. 1999).

>> However, "reckless disregard" should be very narrowly interpreted. . . A "line is to be drawn between an intent to mislead and mere negligence. An honest belief, however unreasonable, that the representation is true and the speaker has information to justify it [has been] held . . . to be no sufficient basis for deceit."

> *Nat'l City Bank v. Manning (In re Manning)*, 280 B.R. 171, 191 (Bankr.S.D. Ohio 2002) (quoting *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 787 (10th Cir. BAP 1998)).

*Copeland*, 291 B.R. at 763.

As an initial matter, the court turns back to Somoye's "promise" that if did know how to do something, he would hire someone who did. That promise is actionable under § 523(a)(2)(A) only if Somogye never intended to perform it when he made it. The court cannot find evidence in the record that reflects negatively on his intent at the outset to hire people who knew what they were doing. The testimony of Fast and Miller shows that the roofing and foundation contractors did a lousy job, at a minimum. But there is no evidence as to how Somogye came to hire them, their backgrounds and experience or their agreements with Somogye functioning as the general contractor on the garage project. In the absence of this kind of information in the record, there is no basis from which the court can find that Somogye instead intended from the get-go to hire incompetent schlocks who did not know what they were doing, perhaps, by way of example only, to get the work done cheaply and increase his margin on

13

the job. The court finds that Plaintiffs have not proven by a preponderance of the evidence that Somogye's breach of his promise that, if he could not do a task, he would hire people who knew what they were doing is actionable under § 523(a)(2)(A) as one he never intended to perform, rather than as a basic breach of promise.

Likewise, the court cannot find from the record that Plaintiffs have proven that Somogye had an awareness or understanding that he did not have the chops to perform and oversee construction of the new garage at the time he told the Otts that he did. The extent of Somogye's described experience based upon the record, including his resume, does not establish that his representation was knowingly false when he made it. He had never been sued by a customer before. At trial he acknowledged that there were problems that occurred, such as the obviously wavy foundation wall and the garage floor. They were, however, in the process of being remedied. The rain and wet weather certainly contributed to some of them, factors unknowable from the outset. And some issues, such as the roof beams presented as differences of opinion. The record lacks evidence from which the court can find that Somogye knew that the garage project was outside his capability to perform or oversee when he told the Otts it was.

The case *Levine v. Blake (In re Blake)*, 401 B.R. 839 (Bankr. S.D. Tex. 2009), stands in illustrative contrast. The debtor in *Blake* represented he was an approved home builder, but used a portfolio and showroom belonging to the actual builder he employed and passed them off as examples of his own work, as well as spending over a quarter of the construction funds for personal use. *Id*. at 844-846.

Similarly, in *Coluccio v. Sevastakis (In re Sevastakis)*, 591 B.R. 197, 204-205 (Bankr. D.N.J. 2018), an experienced contractor was deemed to have knowingly misrepresented his qualifications as he failed to advise the plaintiffs of the need to retain a licensed architect to prepare drawings. He misrepresented his qualifications to draw up the plans, and his method for obtaining permits involved forging plaintiff's name on the permit application, without permission.

Based upon the evidence presented at trial in this case, the court finds that Plaintiffs have not proven by a preponderance of the evidence that Somogye knew the garage build was beyond his capability when he said it was.

Although not made with knowing falsity, under *Rembert* the court must also consider whether Somogye's representation that the garage project was within his capability was made with gross recklessness as to its truth, a closer question. While the Sixth Circuit has not defined "gross recklessness," courts as described above have held that a debtor must have made the representation with reckless disregard for, or conscious indifference to, the truth. *See Copeland*, 291 B.R. at 763; *In re Manning*,

14

280 B.R. at 191; *Pearce v. Muncey (In re Muncey)*, No. 08-51851, 2009 WL 1651451, *5, 2009 Bankr. LEXIS 1466, *14 (Bankr. E.D. Tenn. June 12, 2009).

In a different dischargeability context, the Supreme Court in *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013), addressed the state of mind requirement for § 523(a)(4)'s exception to discharge for defalcation while acting in a fiduciary capacity. The Supreme Court held that "defalcation" includes a culpable state of mind requirement similar to the fraud exception to discharge. *Id.* at 269. The Court described that state of mind as "one involving knowledge of, *or gross recklessness in respect to*, the improper nature of the relevant fiduciary behavior." *Id.* (emphasis added). The Supreme Court explained gross recklessness as conduct of the kind set forth in the Model Penal Code so that "[w]here actual knowledge of wrongdoing is lacking, we consider as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and justifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* at 274. Stated differently, Plaintiffs must prove by a preponderance of the evidence that Somogye disregarded a substantial and justifiable risk or was willfully blind to the risk that the garage project was beyond his capability, even if he did not know it was beyond his capability when he told the Otts that he could do the job.

Another court described the basic concept of "recklessness" in a straightforward manner, as follows:

> A statement is made in "reckless disregard of the truth if the speaker makes the statement without caring about whether the representation is true or false." This must be distinguished from a speaker who negligently makes a false representation but honestly believes the representation to be true--which is not sufficient to prove intent to deceive. And "if there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor."

*They Might Be, Inc. v. Carter (In re Carter),* 593 B.R. 354, 361-62 (Bankr. M.D. Fla. 2018) (footnotes and citations omitted).

The court also cannot find from the record that Somogye should have known of the falsity of his representation that he had the ability to handle the garage project, or that he disregarded a substantial risk or was willfully blind to the fact that the scope of the project exceeded his ability to build and oversee it. Certainly, the record lacks proof from which the court can infer that Somogye simply did not care whether his representation to the Otts was true or false. He honestly believed he could do and oversee the job. At most, the record shows that Somogye made the representation negligently.

Two of the fundamental defects in the project from which the court has inferred falsity were the

15

work of contractors. Again, there is no evidence in the record about how and when he came to hire them or their experience or what the financial arrangements he made with them were such that it can be inferred that Somogye was reckless—let alone grossly reckless—in telling the Otts that he would hire people that knew what they were doing. His supervision of them was negligent, but the court cannot find evidence to turn that into reckless indifference from the outset.

As to the septic system, the description in the contract is general. It contemplated a garage with a "toilet under the stairs and a *small* septic system." (emphasis added). Plaintiffs' witness Larry Miller explained that a septic system calls for more than a waste pipe running into two small holding receptacles. But the court is struck by the contract's characterization of it only as "small." While Miller painted a different picture of the requirements to build a "septic system" than the understanding that Somogye testified to at trial, the court cannot find that his belief that he did not require a permit and that what he installed would do the job for a simple garage toilet is indicative of a conscious indifference to his ability to perform the project overall. And the record is silent as to the manner in which the "small septic system" was ultimately completed by Light if different than the way Somogye apparently left it when he was fired.

Plaintiffs have not proven by a preponderance of the evidence that the Defendant knew his representation that he could do the job was false when he made it or that he consciously disregarded or was willfully blind from the outset to a substantial and justifiable risk that he was not up to the contractual task at hand. On the record presented, the court finds that Plaintiffs have not proven by a preponderance of the evidence that Somogye's representation to the Otts that he was capable of undertaking the job was made with either knowing falsity or gross recklessness as to its truth.

## B. Second Prong of *Rembert*: Intent to Deceive

The second element of *Rembert* requires Plaintiffs to prove by a preponderance of the evidence that Somogye intended to deceive them in entering into a contract he ultimately was not up to performing. [2] The element of intent to deceive is the heart of the § 523(a)(2)(A) exception to discharge. In the instant

---

2 As noted by the bankruptcy court in *In re Copland*, under *Rembert* "[p]roving the Debtor's intent to defraud is similar to proving the Debtor's knowledge and/or recklessness as to the falsity of the representations made." 291 B.R. at 766. The Sixth Circuit has equated the two concepts in cases brought under § 523(a)(2)(B). *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1167) (6th Cir. 1985); *Oster v. Clarkston State Bank (In re Oster)*, 474 Fed. Appx. 422, 427, 2012 WL 987612 (6th Cir. March 26, 2012) (also citing *First Nat'l Bank of Centerville, TN v. Sansom*, 142. F.3d 433 (Table) at *2 (6th Cir. Feb. 2, 1998)). *Cf. Dewitt v. Stewart (In re Stewart)*, 948 F.3d 509, 525 (1st Cir. 2020)("While it may not have been Stewart's intent to harm the DeWitts by not completing their project, the right question is whether he intended to deceive them, through recklessly made misrepresentations, in light of the totality of the circumstances.). *But cf. Collins v. Leonard*, Case No. 18-12476-JDL, Adv. Pro. 18-01081-JDL 2019 WL 1062484 (Bankr. W.D. Okla. March 6, 2019) ("Making a representation to a

factual context, the chaff of breach of contract and negligent performance is separated from the wheat of fraud by whether the speaker intended to deceive the listener. Although fundamental workmanship deficiencies as Plaintiffs have proven occurred support a breach of contract action, the failure to fulfill a promise, standing alone, is not a sufficient ground upon which to base a finding of fraudulent intent for purposes of § 523(a)(2)(A)." *Schroeder v. Bennett (In re Bennett)*, 430 B.R. 463, 468 (Bankr. N.D. Ohio 2010) (citations omitted).

A debtor's intent to defraud a creditor is instead measured by a subjective standard and must be ascertained by the totality of the circumstances of the case at hand. *Rembert*, 141 F.3d at 281-81. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," as direct proof of intent will rarely be available. *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999). As thoughtfully explained by the late Judge Speer of this court:

> An often employed indicia, especially with respect to fraudulent actions under § 523(a)(2)(A), centers on a debtor's subsequent conduct. *Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir. 1996). Of particular evidentiary weight in this regard, especially in situations such as this involving a debtor/contractor, is whether the debtor undertook any of the steps necessary to perform as promised. *Mack v. Mills (In re Mills)*, 345 B.R. 598, 605 (Bankr.N.D. Ohio 2006). In this way, a type of an inverse relationship can be found. On the one side, a debtor acting with an intent to defraud will usually not undertake any significant measures toward the performance of their obligation. *Accord Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir. 1996). Conversely, the opposite is also logistically true—when a debtor undertakes significant steps to perform as promised, inferences of fraud are muted. Thus, as a general rule, this Court has observed that the greater the extent of a debtor's performance, the less likely it will be that they possessed an intent to defraud. *Id.*

*Siebanoller v. Rahrig (In re Rahrig)*, 373 B.R. 829, 834 (Bankr. N.D. Ohio 2007). *See also Sequatchie Mountain Creditors v. Lile*, 585 B.R. 426, 442-43 (N.D. Ohio 2018). Courts can consider subsequent conduct as long as that conduct provides an indication of the debtor's state of mind at the time of the actionable representation. *6050 Grant, LLC v. Hanson (In re Hanson)*, 437 B.R. 322, 327 (Bankr. N.D. Ill. 2010). But again, where "there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *ITT Final Servs. v. Szczepanski (In re Szczepanski)*, 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991).

---

creditor with a 'reckless disregard for the truth' may be some evidence of an intent to deceive the creditor. However, a finding of 'reckless disregard for the truth' translates into subjective intent to deceive (i.e. scienter) only in very narrow circumstances") (citations omitted)).

Somogye was referred to the Otts by a realtor. There is no evidence that he advertised or solicited for their work. The record is silent on what else he was doing or his overall financial circumstances at the time such that one could infer that he would have said anything to get the Otts' project. The testimony and the documents in evidence show that Somogye performed and engaged extensive work on the project, for months. Too many months. Photos show substantial if sloppy work done on the garage. Materials were ordered and delivered to the job site. Subcontractors were engaged and mostly paid. Excavation work was done, stone was laid, the site was graded, the foundation was poured and set to be re-poured, the walls and roof framed in, and siding placed. As in *In re Rahrig*, "[u]nder this type of inquiry the facts bend strongly away from the existence of any intentional wrongdoing on the part of the Defendant." *Rahrig,* 373 B.R. at 834.

Upon depositing the $20,000.00 check from the Otts, Somogye testified that he withdrew funds against that deposit to pay for stone, excavation work, materials and had to pay contractors before they began digging. The bank statements introduced at trial corroborated such withdrawals. As for his subcontractors, Somogye testified they wanted half of their money in advance and the remaining payment upon completion of their work. This is not a project where the contractor took his clients' money, did little or no work and quickly cut and ran. Somogye was around for months.

The testimony also showed that Somogye was trying to remedy mistakes or save money where he could.   For example, he testified to putting plywood on the roof himself, in advance for the roofers, to save being charged by them for carrying it up to the roof, as was customary in the trade, and to continuing to try to fix problems until the Otts terminated him from the project.

There is no dispute that Somogye did not finish the job and that some work was poorly done. But there is no evidence from which the court can find that he did not intend from the outset to complete the Otts' garage and home remodeling project. They fired Somogye after seven months. Somogye did not voluntarily walk away from the job.

Somogye testified how construction costs were broken down for the garage as follows: $12,500.00 for materials; part of the $10,000.00 amount for demolition and moving part of the milkhouse or shed; approximately $1,000.00 for electrical; plumbing was estimated at half of the $3,500.00 quote; and approximately two-thirds of the $15,000.00 amount for labor/construction.   As to some of the other items, he testified that the amount for the kitchen was mostly for cabinets.   The HVAC amount was a direct quote from the HVAC contractor.   The $5,000.00 estimate for the bath was "a guess because he wasn't sure what they wanted." He clarified that the estimate for the cistern was attributable to the house

remodeling. At the outset of the project, Somogye estimated the garage would ultimately cost between $38,000 and $40,000 to construct, with a slight profit for him.

By August 2016 construction of the garage was still ongoing. Mrs. Ott testified that Somogye told her he had gone through the initial deposit of $20,000.00. The Otts wrote additional checks of $900.00 and $800.00 to Somogye in August 2016. This was in addition to a December 29, 2015, check for $1,400.00 Mrs. Ott wrote to Somogye for blueprints. The record shows, however, that he ultimately advanced more funds on the project (approximately $28,000) than he was paid by the Otts ($23,100) before they fired him. This circumstance over the life of the project does not reflect an intent to deceive the Otts into hiring him at the beginning.

This is not a situation where the debtor accepted a deposit for work but then used the deposit to satisfy obligations owed to a vendor for debts unrelated to plaintiff's project. *Stifter v. Orsine (In re Orsine)*, 254 B.R. 184, 187-88 (Bankr. N.D. Ohio 2000). *See also Williams v. Logan (In re Logan)*, 313 B.R. 745, 750 (Bankr. S.D. Ohio 2004). Instead, this case is akin to the situation presented in *Oliver v. Zimmerman (In re Zimmerman)*, 567 B.R. 521, 527-28 (Bankr. N.D. Ohio 2017), where the debtor received a $30,000 deposit for construction of a pole barn and proceeded to have materials, equipment and a crew deployed to the construction site. With eighty-five percent of the framing complete, progress slowed due in part to debtor's illness and a shortage of funds to purchase the materials to finish the project. The court determined this conduct, without more, did not demonstrate that the debtor never intended to complete the construction project. *Id*.

Plaintiffs point to two situations in the truncated course of the project as indicative of Somogye's intent to deceive them from the outset. One involved contracting and payment for drawings on the project. The other involved purchase of shingles for the garage roof. Both involve how funds advanced to Somogye were spent. Neither have anything to do with his qualfications for the job.

Mrs. Ott testified that Somogye charged them $1,400.00 for blueprints of the garage when the true cost of the drawings was $250.00. She referenced an email from the architect stating he was never paid for drawings and identified an email from Somogye dated December 28, 2015, [Plt. Ex. 29], wherein he represented he paid $450 for the garage and $950 for the house prints. This expense was not part of the subsequent written scope of work and project estimate, [Plt. Ex. 1]. However, this money was refunded to her when she confronted Somogye with the knowledge that the architect had not been paid. She also stated her understanding that the architect charged $250.00 for prints of the house and the garage, combined. Mr. Somogye testified that full blueprints for the project were approximately $1,400.00. He

secured drawings, not full blueprints, for approximately $250.00. Somogye testified that his email to Mrs. Ott was a misprint and that he did not pay for full blueprints because the project had not progressed beyond a certain point and full blueprints would have included plumbing and electrical plans.

The court finds this evidence the most troubling presented at trial. Somogye's explanation of the e-mail lacks credibility. It clearly says that he "paid" the architect and uses the terminology "prints" and "certified drawings."   On the other hand, he also refunded Mrs. Ott the overcharge after she confronted him about it at an unspecified time. That cuts both ways. It shows he knew he was wrong, but it also shows that he didn't double down on an alleged con. By itself, however, the court cannot find that Somogye's dissembling on this point constitutes sufficient evidence of an intent to deceive in representing to them his qualifications for the job.

Somogye was also questioned at trial about excess shingles he purchased prior to his termination from the job, perhaps with the goal of having an inference drawn that he intentionally bought more shingles than necessary to divert to some other project. If the latter, Plaintiffs have failed to persuade the court that an inference of deceit can be drawn from the trial evidence on this issue.

Somogye did not concede that he bought more shingles than necessary for roofing the new garage. Although he testified that he no longer had all of the receipts for materials purchased for the project due to the passage of time, two are in evidence showing purchase of shingles. [Plt. Exs. 37 and 38]. One is dated August 1, 2016, [Plf Ex. 37], and the other is dated April 2, 2016, [Plt. Ex. 38]. He theorized that any overage acquired could have resulted from the change in the pitch of the garage roof made at the roofer's recommendation. He also stated that the remodeling project on the Otts' house encompassed repairing the roof as necessary, which he further theorized explained why any additional shingles were purchased in advance of undertaking the house remodeling project. The acquisition of shingles again on August 1, 2016, supports that testimony. But Somogye also indicated that any excess shingles not used before he was fired would have been left at the job site. There is no other evidence about shingles being left at the job site one way or another. The court finds that any excess purchase of shingles lacks indicia of an intent to deceive the Otts reflecting on why he represented to them that he could do the job. There is no evidence, for example, that he was working on other projects where any excess shingles could have been diverted. Somogye was already a long way into the project and the initial deposit by the time additional shingles were purchased on August 1, 2016. While case law supports ongoing and post-representation conduct as potentially indicative of prior fraudulent intent, this is too isolated and remote in time to the February commencement of the project and the discussions leading up to the contract to

20

connect up as an overarching scheme to defraud the Otts. And Plaintiffs have failed to prove an excess or deceitful conduct on Somogye's part with respect to the shingles in any event.

Overall, the court finds that Plaintiffs have not shown by a preponderance of the evidence that Somogye intended to defraud the Otts when he told them he could do the job. The evidence that gives the court the most pause is the incident involving payment for project drawings. On its own, however, that episode is insufficient from which to find that the Otts have proven by a preponderance of the evidence an intent to defraud in making representations about his qualifications. And there is nothing else to connect it with to make it part of an overarching scheme centered on misrepresentation of his ability to build and oversee construction of the new garage. The Otts came to him based on the recommendation of a realtor. He worked for more than six months on the project. There is no evidence that he was working on other projects at the same time. Notwithstanding the issue with payment for the drawings, the evidence showed that Somogye spent on the job more than the Otts paid him. This finding is supported by Mrs. Ott's testimony of having to write additional checks of $800.00 and $900.00, respectively, to the Defendant in August 2016. She testified it was her understanding those funds were for materials which were needed to finish the garage such as shingles, siding, doors and windows. The Defendant's response to Interrogatory No. 5 shows an itemized list of monies paid by Somogye for the project out of the Otts' deposit. [Plt. Ex. 2]. The twelve expenditures on that list total $27,560.00, an amount exceeding the $20,000.00 deposit and the small additional payments.

In short, Defendant's representations and the efforts he undertook to give the Otts their dream garage fell short of the desired and expected contractual outcome. But the court finds that Plaintiffs have not proven by a preponderance of the evidence that Defendant possessed an intent to deceive them into hiring him when he made the representations at issue about his ability to do the job. Somogye credibly believed that he had the knowledge, skill and experience to perform and oversee the garage project.

### C. Third Prong of *Rembert:* Justifiable Reliance

Having decided that Plaintiffs have failed to prove that Defendant misrepresented his qualifications knowingly or recklessly and with intent to deceive them, the remaining prongs of proof required by the Sixth Circuit in *Rembert* are not essential to rendering judgment on the adversary complaint. *See Palmacci*, 121 F.3d at 780 ("[A] factual finding that negates one element of the plaintiffs' prima facie case makes findings concerning other elements unnecessary," quoting *In re Burgess,* 955 F.2d 134, 139(1st Cir, 1992)). Nevertheless, the court will address the elements of justifiable reliance and causation in order to present a complete picture of the evidence. Under the third prong of *Rembert*

Plaintiffs must prove justifiable reliance; *i.e.,* that they actually relied on Defendant's representation that he could do the job, and that based on the facts and circumstances known at the time, their reliance was justifiable.

The Supreme Court held in *Field v. Mans*, 516 U.S. 59, 74-75 (1995), that excepting a debt from discharge under § 523(a)(2)(A) requires a creditor to establish that reliance on a misrepresentation was "justifiable," which is a lower standard than "reasonable" reliance. A person may be "justified in relying on a representation of fact 'although [it] might have ascertained the falsity of the representation had [it] made an investigation.'" *Id.* at 70 (citing Restatement (Second) of Torts § 540 (1976)). Unlike reasonable reliance, which requires a plaintiff's conduct to conform to the standard of the objectively reasonable person, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of application of a community standard of conduct to all cases." *Id.* at 71 (citing Restatement (Second) of Torts § 545A, cmt. b). The Supreme Court also noted, however, that "[j]ustifiability is not without some limits." *Id.* The recipient of a fraudulent misrepresentation is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* (quoting Restatement (Second) of Torts § 541, cmt. a). Quoting the example from the Restatement, the Supreme Court explained:

> [I]f one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, [this rule] applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses.

*Id.* (citing Restatement (Second) of Torts § 541, cmt. A).

As with intent, a court's determination of whether the plaintiff actually relied and whether the reliance was justified is subjective, "based on the facts and circumstances surrounding each individual case." *In re Copeland,* 291 B.R. at 766–67. "To constitute justifiable reliance, the plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility." *Stewart Title Guar. Co. v. Roberts–Dude*, 497 B.R. 143, 151 (S.D. Fla. 2013) (citation, quotation marks, and brackets omitted); *Woodward v. Bethel (In re Bethel)*, 302 B.R. 205, 209 (Bankr. N.D. Ohio 2003) ("[R]eliance is not justifiable if the creditor blindly turns their eyes away from things which would have clearly shown that any reliance on the debtor's

representations was misplaced.") (citation omitted).

Mrs. Ott testified that she and her husband interviewed several contractors "off and on" over the course of several years to build what she characterized as her "dream" garage. This included getting bids from some but not all prospective contractors. Mrs. Ott stated that Brian Somogye was referred to them by a realtor whom they did not know well.

Mrs. Ott recalled that they had interviewed three to five contractors prior to meeting the Defendant. In so doing, they received at least one bid on their proposed project prior to meeting Somogye. When asked what questions they posed to contractors to help them arrive at their decision to choose the Defendant, Mrs. Ott stated it was not the questions they asked of the (other) prospective contractors but that Somogye was referred by a realtor. Mrs. Ott testified she and her husband did not know the realtor well. They did not do any background checks on Somogye, did not ask to see any pictures of his projects, nor did they seek any references. According to Mrs. Ott, they trusted the reference of the realtor.

Mr. Ott confirmed that Somogye was referred by a realtor. He testified that Somogye assured them he had experience related to new construction. Mr. Ott stated that they chose the Defendant because he was "local, close and had done other remodeling, that type of thing."

Based upon the testimony of the Otts, the court finds the element of justifiable reliance is a close call as to whether they actually relied at all on Somogye's representations instead of simply on the realtor's recommendation in making their hiring decision. This was not a situation where Defendant was the first contractor interviewed by Plaintiffs. The Otts contemplated this project for several years and interviewed other contractors "on and off." The vetting of other contractors gave Plaintiffs some experience in terms of expectations and representations by contractors. The difference in this case was a reference by a third party whose expertise was in real estate. This referral was significant enough to cause Plaintiffs to meet with Somogye and enter into a contract for construction of the garage and remodeling of their home. The other factor that weighed in choosing the Defendant was his proximity to Plaintiffs. The Otts and Somogye live on the same road and near the same town.

The court nevertheless finds that Plaintiffs have proven by a preponderance of the evidence that they did actually rely on Somogye's representations. Ultimately Mr. Ott's testimony stringing location and that he "had done other remodeling, that type of thing" together is what shows the court that they actually relied on his communicated ability to the do the job in selecting him for the project. His experience mattered to them. He came to their attention via the realtor, but they hired him because they

23

thought he could do the job as he told them he could.

Having decided that the Otts actually relied on Somogye's representations, there is nothing in the manner in which Somogye presented himself to and dealt with them that should have prompted them to undertake a more searching inquiry into the timing and extent of his new construction experience and how he intended to staff and oversee their project. In particular the timing of Mrs. Ott's discovery that the drawing contractor had not been paid is unknown. In other words, this was not a one-eyed horse situation. In the court's view, that Somogye was referred by a realtor[3] goes less to actual reliance than to justifiability: whether there were any obvious signs of lack of ability that they should have probed further.

Under the circumstances in this case, the court finds that Plaintiffs have established by a preponderance of the evidence that they justifiably relied on the representations by Defendant as to his experience and capabilities.

### D. Fourth Prong of *Rembert*: Proximate Cause

The fourth prong required under *Rembert* to prove nondischargeability under § 523(a)(2)(A) is that the creditor's justifiable reliance must be the proximate cause of its loss. Plaintiffs advance the unpaid amounts in the January 3, 2018, State Court Amended Judgment Entry, [Plf. Ex.40], as their loss.

Damages are legally caused by a misrepresentation only if those pecuniary losses are within the foreseeable risk of harm that it creates. *Friedman v. Campbell (In re Campbell)*, 545 B.R. 875, 895, (Bankr. M.D.N.C. 2016)) (citing *In re Lovato*, 442 B.R. 810, 815 (Bankr. D.N.M. 2011), citing *Restatement (Second) of Torts* § 548A (1977)). "A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." *In re Lovato,* 442 B.R. at 815.

The Supreme Court addressed nondischargeable losses under § 523(a)(2)(A) in *Cohen v. De La Cruz*, 523 U.S. 213 (1998). There, an administrative agency entered an order against a landlord requiring him to refund his tenants $30,000 in rents collected in excess of what a rent control ordinance allowed. The landlord filed for Chapter 7 bankruptcy relief and his tenants filed an adversary proceeding seeking to have the $30,000 debt declared nondischargeable under § 523(a)(2)(A) due to actual fraud. They also sought in the bankruptcy court treble damages and attorney's fees under a state consumer fraud statute. The bankruptcy court declared the $30,000 rent debt nondischargeable and also awarded $90,000 in treble damages plus attorney's fees and costs. The award prompted the question that reached the Supreme

---

3  As already referenced, the fact that Somogye was referred to the Otts by a realtor blunts the idea that he acted with a fraudulent intent to deceive them.   He was not out trolling the Otts for work, as likely marks for fraud and deceit.

Court: does nondischargeability under § 523(a)(2)(A) extend only to the value of what the debtor gained through fraud (for the landlord, $30,000 and for Somogye, approximately $21,700), or does it extend to "all liability arising from fraud," including statutory treble damages? *Id.* at 214-15.

The Supreme Court rejected the landlord's argument that plaintiffs' damages were limited to the $30,000 he obtained from fraud, reasoning that "[o]nce it is established that specific money or property has been obtained by fraud,….any debt arising therefrom is excepted from discharge." *Id.* at 218. Thus, "§ 523(a)(2)(A) prevents the discharge of all liability arising from fraud, and…an award of treble damages therefor falls within the scope of the exception." *Id.*, at 215. There are two distinct concepts embodied in *Cohen*: whether § 523(a)(2)(A) is limited to the value obtained through fraud (the answer is no) and whether a portion of an allegedly nondischargeable debt "arose from" amounts obtained by fraud." Thus, one thing that the Supreme Court did not do in *Cohen* is eliminate the requirement of causation.

At trial, Light testified to finishing the Otts' garage and correcting substandard work. The state court judgment reflects that it determined certain compensatory damage amounts and amounts "for fraud." Given the nature of Defendant's representation as involving his ability to do the job, and the court's determination that Plaintiffs have shown justifiable reliance in hiring him in the first place on the basis of that representation, the amounts set forth in the state court judgment are within the foreseeable risk of harm that would be created by any intentional lie about qualifications to undertake a new construction project. Had Plaintiffs proven Somogye's knowing or grossly reckless misrepresentation of his ability to handle the garage project and his intent to deceive them into hiring him, the loss represented by the judgment amounts were foreseeably incurred and would have been proximately caused by their justifiable reliance thereupon.

**CONCLUSION**

Plaintiffs had to prove that when the parties entered into their agreement, Defendant knew he was incompetent to build the garage, that notwithstanding this knowledge, he represented to Plaintiffs that he could perform and supervise the work, and that he made this representation with the subjective intent and purpose of deceiving Plaintiffs so that they would sign the contract and pay him the deposit. The facts do not demonstrate that this is what happened. Instead, the court is persuaded that when Defendant entered into the agreement with Plaintiffs, he intended to complete this work satisfactorily and sincerely believed he could do so, but that during the course of construction, he encountered problems he did not anticipate or which he was unable to resolve before he was fired by Plaintiffs.

The court finds Plaintiffs have not proven by a preponderance of the evidence that the state court judgment debt Somogye owes them is nondischargeable under § 523(a)(2)(A). The court finds in favor of the Defendant on Plaintiffs' nondischargeability adversary complaint and will enter a separate judgment in his favor in accordance with this Memorandum of Decision.

###